IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

JOSEPH D. DIXON,
      Plaintiff,

vs.                                 Case No. 5:09cv320/RS/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
      Defendant.
_____/

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq.*  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34, and for Supplemental Security Income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I.      PROCEDURAL HISTORY

Plaintiff's applications for DIB and SSI, filed April 27, 2006, were denied initially and on reconsideration (Tr. 15, 24, 24A).[1]  Plaintiff requested a hearing before an administrative law judge

---

[1] All references to "Tr." refer to the Transcript of Social Security Administration Record filed on January 25, 2010 (Doc. 12).  Additionally, the page references used in this Report reflect the page numbers as contained in the original transcript rather than those enumerated in the court's electronic docketing system.

("ALJ"), and following the hearing Plaintiff was found "not disabled" through April 15, 2009, the date of the ALJ's decision (*see* Tr. 15–22). Plaintiff requested review by the Appeals Council ("AC"), and on July 27, 2009, the AC denied Plaintiff's request for review (Tr. 5–7). Thus, the decision of the ALJ stands as the final decision of the Commissioner, now subject to review in this court. Ingram v. Comm'r of Social Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007); Falge v. Apfel, 150 F.3d 1320 (11th Cir. 1998). This appeal followed.

II.    FINDINGS OF THE ALJ

In concluding that Plaintiff was "not disabled," the ALJ made several findings relative to the issues raised in this appeal:

1)    Plaintiff met the insured status requirements of the Act through June 30, 2009.

2)    Plaintiff did not engage in substantial gainful activity after July 4, 2004, the date he alleges he became disabled (thus, the time frame relevant to Plaintiff's claim for DIB is July 4, 2004 (alleged onset) through June 30, 2009 (date last insured)).

3)    During the time frame relevant to this appeal:

(a) Plaintiff had the following severe impairments: history of recurrent shoulder dislocation and lumbar disc degeneration, but neither impairment (or combination thereof) met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(b) Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b)[2] with use of the dominant right arm limited to only occasional reaching, handling, and fingering; and,

(c) Plaintiff was unable to perform any of his past relevant work.

4)    Plaintiff was born on February 15, 1962; he has an eleventh-grade education; and he is able to communicate in English.

---

[2] In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416). Therefore, hereafter, citations in this Report should be considered to refer to the appropriate parallel provision. The same applies to citations of statutes or regulations found in quoted court decisions.

5)      Transferability of job skills is not material to the determination of disability because use of the Medical-Vocational rules as a framework supports a finding that Plaintiff is "not disabled," whether or not he has transferable skills.

6)      Considering Plaintiff's age, education, work experience, and RFC, there were jobs existing in significant numbers in the national economy that Plaintiff could perform; thus, he was not disabled, as defined in the Act, from July 4, 2004, through April 15, 2009.

## III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence.  42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance, it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing substantial gainful activity, he is not disabled.

2.      If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.      If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.      Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his RFC and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.     SUMMARY OF PLAINTIFF'S MEDICAL HISTORY AND OTHER RELEVANT INFORMATION IN HIS ADMINISTRATIVE FILE

A.      Medical History

Plaintiff was treated by Ahmad T. Ismail, M.D., from approximately December 2005[3] through October 2008 (*see* Tr. 116–29, 145–51[4]).  At Plaintiff's first visit with Dr. Ismail, on December 2, 2005, he complained of chronic back pain and pain in his feet (Tr. 129).  X-rays showed possible arthritis in the feet, and Lortab was prescribed for pain (*id.*).  On January 3, 2006, Plaintiff returned and complained of "off and on" right shoulder pain, which was aggravated by arm activity (Tr. 128).  Plaintiff returned on February 1, 2006, and reported increased right shoulder pain with movement (Tr. 127).  On March 2, 2006, Plaintiff returned to Dr. Ismail for medication follow-up and, for the first time, complained of "stress" (Tr. 126).  Dr. Ismail assessed chronic right shoulder pain and anxiety and, in addition to continuing Plaintiff's Lortab, he prescribed Xanax (*id.*).  On April 1, 2006, Plaintiff presented with decreased range of motion in his right shoulder and decreased "grip," but no complaints of weakness and no edema in his extremities (Tr. 125).  He was assessed with status post recurrent anterior dislocation and right shoulder pain, and his medications were continued (*id.*).

On April 19, 2006, Dr. Ismail completed a physical abilities questionnaire provided by Plaintiff's counsel (Tr. 144).  Dr. Ismail noted he had diagnosed Plaintiff with history of recurrent shoulder dislocation and stated that Plaintiff's condition made him "[u]nable to work" (*id.*).  Dr. Ismail also indicated that Plaintiff could not participate in activities, such as "classroom activities, volunteer work[,] etc.," and that his condition was permanent (*id.*).

Plaintiff returned to Dr. Ismail on May 1, 2006, and approximately every month or so thereafter, through February 2007 (*see* Tr. 116–24).  The treatment records are generally the same during this time frame (with the exception of two records noting the presence of cold-like symptoms

---

[3] Plaintiff first presented to Dr. Ismail nearly a year and half after July 4, 2004, the date he alleges he became disabled, and there are no medical records in the file reflecting treatment of any kind between July 2004 and Plaintiff's first visit with Dr. Ismail.

[4] Dr. Ismail's earlier treatment records, concerning Plaintiff's treatment between approximately December 2005 and November 2006, are handwritten and difficult to decipher (*see* Tr. 116–20).  The undersigned has thus considered, in part, the parties' summaries of Plaintiff's treatment during this time in deciphering the handwritten records.

and/or apparent bronchitis (Tr. 118, 122) and one record noting a complaint of insomnia (Tr. 121)). Plaintiff's Lortab was continued throughout, and—at least initially—his Xanax was also continued (*see, e.g.*, Tr. 120–21, 123–25). It appears, however, that after November 20, 2006, the Xanax was discontinued (*see, e.g.*, Tr. 116, 119).[5] On February 27, 2007, Plaintiff returned to Dr. Ismail for a "check up" and to "fill out papers" (Tr. 116). Plaintiff reported that he could not work with his right arm (*id.*). Although he had very limited range of motion in his right shoulder, Plaintiff's cranial nerves were grossly intact, and he had no clubbing, cyanosis, or edema in his extremities (*see id.*). Dr. Ismail assessed "s/p [status post] dislocated shoulder []several times," continued Plaintiff's Lortab, and indicated that Plaintiff should return for follow-up in four weeks (*id.*).

On May 8, 2008, Plaintiff presented to the Holmes County Hospital for a lumbar spine magnetic resonance imaging ("MRI") (Tr. 151).[6] Results showed mild chronic disc deterioration at L5-S1 otherwise minimal lumbar spondylosis, and asymmetric and left lateral bulging of the discs at L4-5 and L5-S1 associated with neuroforaminal encroachment, but no definite spinal stenosis or disc herniation (*id.*).

On June 4, June 21, and July 22, 2008, Plaintiff returned to Dr. Ismail for "check ups" and complained of chronic back pain and/or neurogenic claudication (Tr. 148–50). Plaintiff's cranial nerves were grossly intact, his straight-leg raising and range of motion were full, and he had no clubbing, cyanosis, or edema in his extremities (*see id.*). Dr. Ismail assessed chronic back pain and/or neurogenic claudication, and on the June 21 and July 22 visits he prescribed Lortab and Xanax (*id.*). Plaintiff returned in August, September, and October of 2008; Dr. Ismail's assessments included chronic back pain, right shoulder pain, and shoulder pain with a history of recurrent dislocations (Tr. 145–47). The treatment records from August through October are generally the same except the Xanax was not continuously prescribed (*see id.*).[7] Additionally, in August 2008 Dr.

---

[5] On October 21, 2006, Dr. Ismail completed a questionnaire, on which he opined that Plaintiff did not suffer from a mental impairment that significantly interfered with his daily functioning (Tr. 115).

[6] Although Plaintiff underwent a consultative examination in May 2007 (*see* Tr. 130), there are no records in the file documenting treatment of any kind between Plaintiff's last visit with Dr. Ismail (February 27, 2007) and the day he obtained the lumbar spine MRI (May 8, 2008).

[7] The typewritten treatment records from August through October 2008 reflect prescriptions for Lortab only, but the September record contains a handwritten notation that states, "[illegible] 10-10-08 Xanax #30" (*see* Tr. 146).

Ismail noted some mild tenderness in the left hip and some limited range of motion, but Plaintiff's cranial nerves were grossly intact; he had no spasm, complaints of weakness, or bowel or bladder complaints; and he was negative for clubbing, cyanosis, or edema in his extremities (Tr. 147). In September and October 2008, Dr. Ismail noted Plaintiff's return to a full range of motion and full straight-leg raising (Tr. 145–46). He also noted, as before, that Plaintiff's cranial nerves were grossly intact; he had no clubbing, cyanosis, or edema in his extremities; and he had no bowel or bladder complaints (Tr. 146, 148).

Finally, Dr. Ismail completed three additional forms provided to him by Plaintiff's counsel. First, on October 9, 2008, Dr. Ismail completed another physical abilities questionnaire (Tr. 152). Dr. Ismail noted that Plaintiff was "[status post] recurrent dislocation of [right] shoulder," and he opined that Plaintiff's was permanently "[u]nable to 'work' at all," including while standing up or sitting down, and was unable to volunteer or attend classes (*id.*). Dr. Ismail also wrote that Plaintiff was not required to attend physical therapy, counseling appointments, or "any other type of therapy or regular appointments" (*id.*). Second, on December 4, 2008, Dr. Ismail completed a "Clinical Assessment of Pain" form on which he circled choices in response to questions concerning Plaintiff's pain and medications (Tr. 153). Specifically, Dr. Ismail indicated that (1) Plaintiff's pain was present to such a degree as to distract from adequate performance of daily activities or work, (2) physical activity increased Plaintiff's pain to the extent that it would cause distraction from, or total abandonment, of tasks, and (3) medication side effects could be expected to limit Plaintiff's effectiveness at work due to "distraction, inattention, drowsiness, etc." (*id.*). And third, also on December 4, 2008, Dr. Ismail completed a questionnaire regarding Plaintiff's shoulder and physical "limitations and abilities" (Tr. 154–55). In relevant part Dr. Ismail indicated that Plaintiff had instability, pain, limitation of motion, and chronic dislocation in the right shoulder (Tr. 154). And he offered the following opinions regarding Plaintiff's limitations and abilities: (1) Plaintiff could "work" a total of two hours per day, but in an eight-hour workday could stand two hours, sit four

---

It appears, therefore, that Plaintiff's Xanax was renewed for a thirty-day period on one occasion between August and October 2008. However, none of Dr. Ismail's records between June and October 2008 reflect a diagnosis of anxiety or any other mental health impairment (*see* Tr. 145–50).

hours at a time, and sit a total of eight hours,[8] (2) Plaintiff could frequently or occasionally lift with his left hand but never lift with his right hand or raise his right <u>or</u> left arm over shoulder level, and (3) Plaintiff could both "frequently" and "never" use his left arm below shoulder level (the questionnaire contained the same question twice regarding use of the left arm below shoulder level, and Dr. Ismail answered "frequently" in response to the first question and "never" in response to the second question) (*see* Tr. 154–55).

B.      Opinions of Examining and Non-Examining Agency Physicians

On May 14, 2007, Plaintiff underwent a consultative examination by Herbert E. Brooks, M.D. (Tr. 130–34). Dr. Brooks noted that Plaintiff "gives a history of mainly one major problem and that is marked difficulty with his right shoulder," which—per Plaintiff—had been dislocated several times (Tr. 130). Plaintiff reported that his current medications included Lortab only and that he took it "at bedtime" only (*id.*). Plaintiff stated he experienced pain with any right arm motion and denied "any other problems except mild temporary pain in the right lumbosacral area" (*id.*). On physical examination, Plaintiff had right shoulder pain with motion, very poor right arm function, and poor ability to button his shirt or use his right arm to do anything requiring reaching out from his body (*id.*). However, his muscles were firm, his sensation was intact, his reflexes were "1+" and equal, and his grip strength was "5/5" in his left hand and "4/5" in his right hand (*id.*). Plaintiff had slight right paraverteberal lumbar area muscle tenderness but no paraverteberal muscle spasm (*id.*). Dr. Brooks assessed "chronic right shoulder pain aggravated by any shoulder motion" and "ligamentous instability possible torn right rotator cuff right shoulder" (Tr. 131). He recommended possible reconstructive surgery and opined that Plaintiff should be able to do any kind of work not involving use of his right arm (*id.*).

Clarence Louis, M.D., a non-examining agency physician, completed a Physical RFC Assessment on June 14, 2007 (Tr. 136–43). He opined that Plaintiff was able to frequently lift or carry ten pounds, occasionally lift or carry twenty pounds, and stand, walk, or sit for six hours in an

---

[8] As will be discussed *infra*, these opinions (and others on the forms filled out by Dr. Ismail) are internally inconsistent—a point mentioned here to clarify that court's summary of the information accurately reflects what is noted on the forms.

eight-hour workday (Tr. 137). He noted limitation in Plaintiff's ability to reach and perform fine or gross manipulation due to his right shoulder, but no postural, visual, communicative, or environmental limitations were noted (Tr. 138–40).

        C.     Other Relevant Information Within Plaintiff's Claim File

            (1)    <u>Observations of Plaintiff and Plaintiff's Statements/Testimony</u>

On June 15, 2006, Plaintiff spoke to a Social Security Administration ("SSA") employee M. Cain over the telephone regarding his application (Tr. 84–86). Employee Cain noted that Plaintiff had no difficulty reading, understanding, concentrating, talking, or answering (Tr. 85). In a Disability Report, Plaintiff related that he had no side effects from his Lortab (Tr. 91). He also wrote that he took his Xanax only as needed (*id.*). On April 12, 2007, Plaintiff spoke to SSA employee Allison Walding over the telephone regarding his application (Tr. 109). Plaintiff reported that he saw Dr. Ismail once a month for his shoulder but that he was not currently receiving physical therapy or injections (*id.*). On April 16, 2007, Plaintiff again spoke with Ms. Walding over the telephone (*id.*). He related that small things, such as buttoning his shirt, were a problem, and that he could care for his personal needs only slowly; he also stated that his left arm was fine and that he could make simple meals and do some household chores (*id.*).

At his hearing before the ALJ, held November 17, 2008, Plaintiff testified that he dislocated his right shoulder three or four years earlier while playing basketball and that it continues to "pop out" causing a lot pain (Tr. 161–63). He also reported that he tried to return to construction work after he first dislocated his shoulder, but he could not lift anything with his right hand (and is right-hand dominant) (Tr. 163, 167). Plaintiff testified that he has back pain that makes it difficult to sit more than thirty to forty minutes and that he could return to his construction work but for his right shoulder (Tr. 172). He also related that he can lift thirty pounds with his left hand and write and hold a hammer with his right hand, but he avoids using his right hand, cannot swing a hammer with his right hand without dislocating his shoulder, and can lift his right arm only to face level (Tr. 164, 166–67, 173, 180). Plaintiff testified that he is able to watch his children (aged six and seven) when his wife goes shopping and can perform some household chores using his left hand, including vacuuming, cooking breakfast, loading the washing machine, and helping with the groceries (Tr.

167, 169, 173). He also reported that he follows the news and goes fishing once a month, attends church twice a month, and reads the Bible an hour a day (Tr. 169–71). Plaintiff testified that he had not driven in ten years, but he explained that he had not driven because of an alcohol-related traffic offense, not because of his shoulder (Tr. 167–68). He also reported that he has no problem standing or walking for one to two hours at a time (Tr. 173). With regard to mediation, Plaintiff testified that he took Lortab for pain and that it caused him to dose off about three times a day (Tr. 165–66), and he reported that he took Xanax but still had trouble sleeping (Tr.171).

(2)    <u>Testimony of the Vocational Expert</u>

The ALJ asked the vocational expert ("VE") to consider a hypothetical claimant of Plaintiff's age, education, and work experience, who could sit, stand, and walk about six hours each in an eight-hour workday, lift twenty pounds occasionally and ten pounds frequently, was right-hand dominant, and could only occasionally grasp, finger, and reach overhead with his right arm (Tr. 177). The vocational expert testified that the claimant could work (in regionally and nationally-available jobs) as a gate guard, ticket taker, parking lot cashier, surveillance-system monitor, and order clerk (Tr. 178). The VE also testified that the hypothetical claimant could perform these jobs if he could do things with his right arm below shoulder level only (Tr. 180).

V.    DISCUSSION

Plaintiff raises three issues in the instant appeal, which are rearranged in this Report for organizational purposes. Plaintiff contends the ALJ erred: 1) by failing to properly evaluate his anxiety, 2) by failing to properly discount his complaints of pain, and 3) in discounting the opinions of Dr. Ismail, a treating physician (*see* Doc. 14 at 10).

A.    Evaluation of Plaintiff's Mental Impairment

Plaintiff alleges the ALJ erred in finding his anxiety "non-severe" at step two of the sequential evaluation because he failed to follow the "special technique" that is required in evaluating mental impairments (Doc. 14 at 18 (citing 20 C.F.R. § 404.1520a)).

In applying the special technique an ALJ must first determine whether a claimant has a "medically determinable mental impairment." *See* 20 C.F.R. § 1520a(b).[9] If such an impairment exists, an ALJ must then complete a Psychiatric Review Technique Form ("PRTF") and append it to his decision <u>or</u> incorporate its mode of analysis into his findings and conclusions. <u>Moore v. Barnhart</u>, 405 F.3d 1208, 1213–14 (11th Cir. 2005) (per curiam). More specifically, an ALJ is required to evaluate "how the claimant's mental impairment impacts four functional areas: 'activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.'" *Id.* at 1213 (citing 20 C.F.R. § 404.1520a(c)(3-4)). In rating the degree of functional limitation in the first three areas, a five-point scale is used (i.e., none, mild, moderate, marked, and extreme), and in rating the degree of functional limitation in the fourth area, a four-point scale is used (i.e., none, one or two, three, four or more). 20 C.F.R. § 1520a(c)(4).[10] An ALJ's failure to append a PRTF to his decision or otherwise incorporate its mode of analysis into his findings and conclusions, when a "colorable claim" of mental impairment has been presented, "requires remand." <u>Moore</u>, 405 F.3d at 1213–14 (citing 20 C.F.R. § 404.1520a(c)(3-4)); *see also* <u>Ehrisman v. Astrue</u>, 2010 WL 1780248, at *2 (11th Cir. May 5, 2010) (citing <u>Moore</u>, 405 F.3d 1208; 20 C.F.R. § 404.1520a(e)(2) ("the [ALJ's] written decision must incorporate the pertinent findings and conclusions based on the technique").

In the instant case, in evaluating Plaintiff's anxiety the ALJ stated only that "[Plaintiff's] alleged impairment of anxiety does not cause more than minimal limitations in [Plaintiff's] ability to perform basic work activities; therefore, [it] is a non-severe impairment" (Tr. 19). The Commissioner acknowledges that the ALJ failed to apply the special technique, and he concedes that

---

[9] Section 404.1508 discusses what is needed to show a medically determinable impairment and states in relevant part that: "Your impairment must result from . . . psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A . . . mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms . . . ." 20 C.F.R. § 404.1508.

[10] A mental impairment is generally found non-severe at step two if the degree of limitation in the first three functional areas is "none" or "mild" and is "none" in the fourth area. 20 C.F.R. § 404.1520a(d)(1). If an impairment is deemed severe at step two, an ALJ must continue to step three—where, with regard to anxiety—"marked" functional limitations must generally be present satisfy the criteria of the listing. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing 12.06 ("Anxiety Related Disorders")).

the ALJ's failure to do so at step two (that is, in concluding that Plaintiff's anxiety is a "non-severe" mental impairment) constitutes error (*see* Doc. 19 at 12).[11] The Commissioner asserts, however, that the error is harmless because the ALJ would have reached the same overall conclusions had he applied the special technique (*see* Doc. 19 at 12–15).

In Moore, the Eleventh Circuit addressed an ALJ's failure to apply the special technique and noted as follows:

> On appeal, the Commissioner concedes (as she must) that the ALJ erred in not completing the PRTF or complying with its mode of analysis. The Commissioner argues, however, that remand is unnecessary as it would require no more than the ALJ's rote completion of the PRTF. We cannot agree. The ALJ failed to even analyze or document [the claimant's] condition in two of the PRTF's functional areas: social functioning and prior episodes of decompensation. Because the ALJ's decision lacks consideration of these factors and their impact on his ultimate conclusion as to [the claimant's] RFC, we cannot even evaluate the Commissioner's contention that the ALJ's error was harmless.

Moore, 405 F.3d at 1214.

The Eleventh Circuit, however, did not hold that an ALJ's failure to apply the special technique could <u>never</u> be deemed harmless error; rather, the court stated that under the facts presented it could not evaluate whether the ALJ's error was harmless. *Id.* Indeed, the court specifically stated as follows: "We thus join our sister circuits in holding that <u>where a claimant has presented a colorable claim of mental impairment</u>, the social security regulations require the ALJ to complete a PRTF and append it to the decision, or incorporate its mode of analysis into his findings and conclusions. Failure to do so requires remand." *Id.* (emphasis added). Thus, remand is required when <u>two</u> factors are present: (1) a claimant has presented of a "colorable claim" of mental impairment, and (2) an ALJ has failed to apply the special technique. *See id.*

In the instant case, the undersigned concludes that the ALJ committed no error in failing to apply the special technique because Plaintiff failed to present a colorable claim of mental

---

[11] Although the ALJ did not specifically address the four functional areas that must be addressed in applying the special technique, the ALJ referenced "basic work activities," which are defined in 20 C.F.R. § 404.1521(b) as the "abilities and aptitudes necessary to do most jobs," such as the abilities to use appropriate judgment or respond appropriately to supervision, co-workers, and usual work settings—which abilities are similar to those included in the four functional areas. The ALJ, however, erred at step two in failing to specifically address the four functional areas of the special technique, as described in Section 404.1520a(c)(3).

impairment. In so concluding the undersigned has considered the record as a whole, including the following specific portions of the record:

- Plaintiff worked after the date he alleges he became disabled (*see* Tr. 70–75 (reflecting, in relevant part, that he earned $1,736.00 in 2005 working at West Florida Enterprises)).[12]

- On June 15, 2006, Plaintiff was interviewed by SSA employee M. Cain, who noted no difficulties with regard to Plaintiff's ability to understand, concentrate, or speak coherently (Tr. 85). Thereafter a Disability Report was completed, which in relevant part reflects that: (a) in response to a question asking "What are the illnesses, injuries, or conditions that limit your ability to work," Plaintiff answered "dislocated shoulder"; and similarly, in response to a question asking "How do your illnesses, injuries, or conditions limit your ability to work," Plaintiff answered "I can't use right arm. I am unable to lift anything hardly"; (b) in response to a question asking "Why did you stop working," Plaintiff answered "hurt arm"; and (c) Plaintiff reported he had never "been seen by a doctor/hospital/clinic or anyone else for emotional or mental problems that limit [his] ability to work" (*see* Tr. 84–93) (emphases added).

- On October 21, 2006, Dr. Ismail was asked whether Plaintiff suffered "from a mental impairment that significantly interferes with daily functioning," and he answered "no" (Tr. 115).

- In a Disability Report completed on February 14, 2007, Plaintiff reported that since he last completed a Disability Report: (a) there had been no change in his illnesses, injuries, or conditions; (b) he had no new physical or mental limitations as a result of his illnesses; (c) he had no new illnesses or injuries; and (d) he had not seen (and had no plans to see) a "doctor/ hospital/clinic or anyone else for emotional or mental problems that limit [his] ability to work" (Tr. 94–95).

- On February 27, 2007, Plaintiff reported to Dr. Ismail that he could not work with his right arm and asked Dr. Ismail to fill out disability paperwork (*see* Tr. 116).

- On March 25, 2007, Plaintiff completed a Work History Report, on which he: (a) described a nearly continuous work history, from approximately 1980 through 2004, and (b) noted that four of his six prior jobs during that time, including his most-recent prior job, required technical

---

[12] Plaintiff described this work as "remodeling" work and noted it was "basically the same" as his previous construction work, but he apparently used his left hand/arm for lifting in his work as a remodeler (*see* Tr. 163).

knowledge and skill (Tr. 101–03, 105, 107), and one job required writing, completing reports, or performing similar duties (Tr. 104).

●  Plaintiff contacted the SSA on April 12, 2007, and stated he was unable to work "because of repeated dislocations of his [right] shoulder."

●  Plaintiff made no complaints of mental health impairments until he reported being "stressed" to Dr. Ismail in March 2006, approximately twenty months after the date he alleges he became disabled, and Plaintiff was treated for anxiety (i.e., by Dr. Ismail's prescribing of Xanax) for only a short period of time during the time frame relevant to this appeal (i.e., from approximately March through November of 2006, June through July of 2008, and one thirty-day period between August and October of 2008) (*see* Tr. 120–26, 146, 148–49).

●  At the outset of Plaintiff's hearing before the ALJ, Plaintiff's attorney announced in an opening statement that Plaintiff was requesting disability based on "recurrent problems with dislocated shoulder" and "non-exertional impairments [i.e., pain] caused thereby," noting that Dr. Ismail "supports [Plaintiff's] assertions of disability" (Tr. 159–60; *see also* Tr. 162–63).[13]

●  And, near the conclusion of Plaintiff's hearing, he testified that he could return to his construction job if his "right shoulder was okay" (Tr. 172).

As can be seen, Plaintiff's disability claim is clearly based on problems associated with recurring dislocations of the right shoulder.  In fact, Plaintiff specifically testified that he could return to his former work but for his shoulder, and similarly, he reported that the reason he stopped working was his "hurt arm."  Moreover, his earnings records and previous work history reflect an ability to work without interference from any psychologically-based problems.  Indeed, Plaintiff worked nearly continuously for twenty-four years, and there is no evidence of any deterioration in his mental health since he last worked (other than his report of being "stressed" nearly two years after he ceased working).  Furthermore, Plaintiff has no history of any specialized mental health

---

[13] Plaintiff's counsel questioned Plaintiff during the hearing, and his questioning (and statements) almost entirely concerned problems associated with Plaintiff's right shoulder (*see* Tr. 159–60, 164–66).  At the conclusion of counsel's questioning, however, he asked Plaintiff the following question: "And your doctor's also prescribing Xanax or is nerves [sic] still something that you're having a problem with?" (Tr. 166).  Plaintiff's answer to the question is inaudible, as is his answer to counsel's follow-up question: "Talk to me about that." (*see id.*).  Notwithstanding, it is evident that counsel and Plaintiff asserted disability based on Plaintiff's shoulder since that is the only condition for which Dr. Ismail "supports [Plaintiff's] assertions of disability."

treatment (although he was "treated" by Dr. Ismail, Dr. Ismail is not a mental health specialist), and the record contains no diagnostic findings or any medical evidence consisting of signs, symptoms, and laboratory findings to establish the existence of Plaintiff's anxiety. At most, the evidence presented demonstrates that Plaintiff reported to Dr. Ismail that he was "stressed," and Dr. Ismail subsequently diagnosed anxiety and prescribed Xanax during a limited and non-continuous portion of the time frame relevant to this appeal. Such evidence is insufficient to establish a "colorable claim" of mental impairment.[14]

Even if the undersigned assumes Plaintiff presented a colorable claim of mental impairment, the undersigned nevertheless concludes Plaintiff is not entitled to relief because the ALJ's error in failing to apply the special technique at step two was—as the Commissioner asserts—harmless, as the evidence fails to support a finding that Plaintiff's anxiety was severe. This is so even though Plaintiff was diagnosed with anxiety by Dr. Ismail. *See, e.g.*, Salles v. Comm'r. of Social Security, 229 Fed. Appx. 140, 145 (3d Cir. 2007) (diagnoses alone, including diagnosis of depression, insufficient to establish severity at step two). To establish severity at step two, Plaintiff must present evidence demonstrating that his anxiety significantly limited his ability to do basic work activities or impaired his capacity to cope with the mental demands of working. *See* 20 C.F.R.

---

[14] Although the Eleventh Circuit Court of Appeals has not yet defined what constitutes a "colorable claim of mental impairment," courts within the circuit have addressed facts similar to those of the instant case and concluded that no colorable claim had been established. *See, e.g.*, Sesberry v. Astrue, No. 3:08cv989/J/TEM, 2010 WL 653890, at *3–5 (M.D. Fla. February 18, 2010) (claimant's medical record included two notations of depression from one of the claimant's treating physicians, who also referred claimant to a psychiatrist for an evaluation and prescribed an antidepressant, but the court concluded that "this evidence, without more, does not establish a colorable claim of mental impairment."); Beattie v. Astrue, No. 5:09cv5/Oc/GRJ, 2009 WL 4510117 (M.D. Fla. Dec. 1, 2009) (plaintiff's evidence of isolated hospitalization for attempted suicide and testimony of depression was insufficient to establish a colorable claim of mental impairment); Kellerman v. Astrue, No. 5:08cv373Oc/GRJ, 2009 WL 3586554 (M.D. Fla. Oct. 28, 2009) (plaintiff failed to establish colorable claim of mental impairment when only a single medical record related to the asserted depression and an anti-depressant was listed as a current medication). *See also* Bryant v. Astrue, No. 7:06cv00151/FL, 2008 WL 2037421 (E.D.N.C. May 12, 2008) (plaintiff did not present enough evidence to support a colorable claim of mental impairment when the evidence consisted of a doctor's impression that plaintiff suffered from Gulf Way Syndrome based on statements of plaintiff and another medical record with reference to Gulf War Syndrome and Post Traumatic Stress Disorder as reported by plaintiff, but there was no evidence of follow-up on the asserted mental impairment) (*remanded on other grounds*). *Cf.* Driver v. Astrue, No. 1:07cv3014/AJB, 2009 WL 631221, at *24–25 (N.D. Ga. 2009) (colorable claim of mental impairment presented where claimant offered depression at her hearing as a basis for disability and specifically testified before the ALJ about her depression and limitations caused by it, which limitations might interfere with her ability to work).

§§ 404.1520(c), 404.1521(a); *see also* <u>Ramirez v. Barnhart</u>, 372 F.3d 546, 550 (3d Cir. 2004); <u>Salles</u>, 229 Fed. Appx. at 145.

There is no such evidence here; indeed, Dr. Ismail—the doctor who diagnosed Plaintiff's anxiety—specifically opined that Plaintiff suffered "from [no] mental impairment that significantly interferes with [his] daily functioning" (Tr. 115). Thus, had the ALJ applied the special technique, Plaintiff's anxiety would have been found non-severe at step two because the record—consistent with the ALJ's finding that Plaintiff had no more than minimal functional limitations as a result of his anxiety—establishes that Plaintiff had "no" or at most only "mild" functional limitations. *See* 20 C.F.R. § 404.1520a(d)(1). Moreover, to be found severe at step two, an impairment must meet the twelve-month "duration requirement," that is, it must exist "for a continuous period of at least 12 months." *See* 20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii). And as previously noted, Dr. Ismail's records are the only records that concern Plaintiff's anxiety, and those records do not establish that Plaintiff's anxiety existed for a continuous, twelve-month period. Thus, the ALJ's failure to apply the special technique in this case is harmless. *See* <u>Rabbers v. Comm'r of Social Sec. Admin.</u>, 582 F.3d 647, 648, 655 (6th Cir. 2009) (harmless error found where ALJ failed to make required findings regarding severity of a mental impairment, as error did not deprive claimant of a substantial procedural right; nor did it prejudice him on the merits because record indicated that his bipolar disorder was not severe enough to render him disabled); <u>Kohler v. Astrue</u>, 546 F.3d 260, 269 (2d Cir. 2008) (noting that "an ALJ's failure to adhere to the regulations' special technique might under other facts be harmless"); <u>Craft v. Astrue</u>, 539 F.3d 668, 675 (7th Cir. 2008) ("Under some circumstances, the failure to explicitly use the special technique may indeed be harmless error."); <u>Gutierrez v. Apfel</u>, 199 F.3d 1048, 1051 (9th Cir. 2000) (where claimant presents colorable claim of mental impairment, ALJ's failure to comply with PRTF regulations requires remand); 20 C.F.R. 404.1520a(b). *See also* <u>Diorio v. Heckler</u>, 721 F.2d 726, 728 (11th Cir. 1983) (the ALJ's decision will stand when an incorrect application of the regulations results in "harmless error," because the correct application would not contradict the ALJ's ultimate findings); <u>Brueggemann v. Barnhart</u>, 348 F.3d 689, 695 (8th Cir. 2003) (the harmless error inquiry involves determining "whether the ALJ would have reached the same decision denying benefits, even if he had followed the proper procedure . . . ."). Accordingly, Plaintiff is not entitled to relief on this claim.

B.      Eleventh Circuit Pain Standard

Plaintiff next contends the ALJ erred in failing to properly discount his subjective complaints (*see* Doc. 14 at 15–18).  While somewhat unclear, Plaintiff appears to generally assert that the ALJ failed to apply the Eleventh Circuit pain standard, and had he done so Plaintiff's complaints of disabling pain would have been fully credited (*see id.* at 16–21).  Plaintiff also complains that the ALJ erred in failing to articulate specific reasons in support of his credibility findings and improperly considered Plaintiff's daily activities in discounting his complaints (*see id.* at 15–18).

As this court is well aware, pain and other subjective complaints are treated by the Regulations as symptoms of disability.  Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, ". . . unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms."  The Eleventh Circuit has articulated a three-part pain standard, sometimes referred to as the <u>Hand</u> test, as follows:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

<u>Hand v. Heckler</u>, 761 F.2d 1545, 1548 (11th Cir. 1986) (originally adopting the three-part pain standard).  The Eleventh Circuit continues to follow the <u>Hand</u> test.  <u>Wilson v. Barnhart</u>, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing <u>Holt v. Sullivan</u>, 921 F.2d 1221, 1223 (11th Cir. 1991); <u>Ogranaja v. Commissioner of Social Security</u>, 186 Fed. Appx. 848, 2006 WL 1526062, at *3 (11th Cir. June 5, 2006) (quoting <u>Wilson</u>).

Underlying the <u>Hand</u> standard is the need for a credibility determination concerning a plaintiff's complaints.  Those complaints are, after all, subjective.  "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain [or other symptoms]."  <u>Scharlow v. Schweiker</u>, 655 F.2d 645, 649 (5th Cir. Sept. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints").  People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others.  "Reasonable minds may differ as to whether objective medical impairments could

reasonably be expected to produce [the claimed symptom]. This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts to ensure that the finding is supported by substantial evidence." Hand, 761 F.2d at 1548–49. It is within the ALJ's "realm of judging" to determine whether "the quantum of [symptoms a claimant] allege[s] [is] credible when considered in the light of other evidence." Arnold v. Heckler, 732 F.2d 881, 884 (11th Cir. 1984). The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief or the plaintiff's claims, is the basis for the ALJ's credibility determination.

It is evident in the instant case that the ALJ recognized his duty to evaluate Plaintiff's complaints in a manner consistent with the Hand standard because he specifically referenced 20 C.F.R. § 404.1529 (see Tr. 19). It is also evident after a review of the ALJ's entire opinion that he applied the correct standard and thereafter concluded, properly, that Plaintiff's complaints were not fully credible.

Initially, the ALJ noted the existence of underlying medical conditions, specifically, Plaintiff's lumbar disc degeneration and history of recurrent right shoulder dislocations—conditions the ALJ found "severe." And with regard to whether objective medical evidence confirms the severity of pain related to these conditions, the ALJ noted Plaintiff's lumbar spine MRI, which revealed mild disc deterioration at L5-S1 with minimal lumbar spondylosis elsewhere, and some left lateral bulging of the discs at L4-5 and L5-S1 associated with neuroforaminal encroachment, but no definite spinal stenosis or disc herniation (Tr. 18; see also Tr. 151). These minimal findings do not constitute objective medical evidence confirming severe or disabling back pain (of which Plaintiff did not actually complain).[15] Rather, as previously noted, Plaintiff alleged disability based on pain and limitations related to his right arm and shoulder (see, e.g., Tr. 162–64, 166–67), for which there is essentially no objective medical evidence substantiating the condition or its severity (other than,

---

[15] Plaintiff testified his back begins to bother him if he sits for a long time, but he stated he previously worked with no problems attributable to his back condition and could return to work but for problems associated with his right arm/shoulder (Tr. 172). Moreover, the ALJ noted Dr. Ismail's recent treatment notes reflecting Plaintiff's "full range of motion" and ability to perform straight leg raising (Tr. 18).

arguably, the results of Dr. Brooks' consultative examination).[16]  Notwithstanding, the ALJ accepted Plaintiff's testimony regarding his condition (that is, he accepted that Plaintiff actually experienced recurrent shoulder dislocations and limitations related thereto) but concluded, consistent with the <u>Hand</u> standard, that Plaintiff's condition was not of such severity that it could reasonably be expected to give rise to disabling pain or preclude "work at <u>all</u> levels" (*see* Tr. 19–20) (emphasis added).  More specifically, the ALJ found that Plaintiff's shoulder condition could reasonably cause some of his alleged symptoms but not to the extent Plaintiff would be precluded from performing light work with restrictions related to the right arm and hand (i.e., only "occasional" right-sided reaching, handling, or fingering) (*see* Tr. 19–20).  These restrictions are consistent with the findings of Dr. Brooks, which the ALJ noted and discussed (*see* Tr. 18 (noting, in relevant part, that Dr. Brooks' consultative examination revealed poor functioning of the right arm but adequate use of the right hand)).  Similarly, the ALJ relied on the VE's testimony in finding that work was available that Plaintiff could perform <u>with the right-sided restrictions</u>.[17]

The ALJ also noted that Plaintiff received only conservative care for his shoulder (that is, pain medication) by Dr. Ismail (Tr. 17, 20) and did not seek treatment by an orthopedic or pain management specialist (Tr. 20).  *See* <u>Wolfe v. Chater</u>, 86 F.3d 1072, 1078 (11th Cir. 1996) (ALJ may consider treatment that is "entirely conservative in nature" in discrediting a claimant's testimony); <u>Miller v. Astrue</u>, No. 8:07cv2074, 2009 WL 3516, at *5 (M.D. Fla. January 6, 2009) (same); <u>Woodum v. Astrue</u>, No. 8:07cv404, 2008 WL 759310, at *3 (M.D. Fla. March 20, 2008) (ALJ properly considered that "limited and conservative treatment . . . is inconsistent with the medical response that would be expected if the physician(s) found the symptoms and limitations to be as severe as reported by the claimant").  Similarly, the record reflects significant gaps in

---

[16] Of note, Plaintiff testified that he underwent shoulder surgery in 2004 or 2005 (*see* Tr. 161–62, 164–65), but there are no surgery records in the file.  The lack of such records is curious because Plaintiff testified that the surgery took place at a particular hospital, so he knew where his surgical records could be obtained, <u>and</u> Plaintiff was provided with time to supplement his file with the records (*see* Tr. 165, 182), but neither Plaintiff nor his attorney did so.

[17] For example, the VE specifically noted that the jobs he identified (which are the same jobs the ALJ found Plaintiff could perform) could be performed by someone who is able to use the right arm below shoulder level (*see* Tr. 22, 178, 180).  Moreover, although the VE testified that Plaintiff could not work if he had <u>no</u> use of the dominant right arm/hand (because the jobs he identified usually require some writing), Dr. Brooks specifically noted that Plaintiff could use the right hand, and Plaintiff specifically testified that he retained the ability to write with his right hand (*see* Tr. 22, 179–80).

treatment during the time frame relevant to this appeal.  For example, Plaintiff sought no treatment for nearly a year and a half following the date he alleges he became disabled.  And, after reporting to Dr. Ismail that he could not work and asking Dr. Ismail to fill out disability paperwork on February 27, 2007, Plaintiff sought no additional treatment for more than one year (that is, until May 8, 2008, when he obtained an MRI).  *See, e.g.,* Watson v. Heckler, 738 F.2d 1169, 1173 (11th Cir. 1984) (in addition to objective medical evidence, it is proper to consider, among other factors, a claimant's failure to seek treatment in evaluating his or her credibility); *see also* Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995) (failure to seek medical treatment for a long time during a claimed period of disability tends to indicate tolerable pain).

Continuing, the ALJ discussed Dr. Ismail's recent treatment notes reflecting Plaintiff's "full range of motion" and ability to perform straight leg raising (Tr. 18).  Additionally, the ALJ noted that Plaintiff's allegations regarding disabling limitations were inconsistent with his reported activities, such as fishing and caring for his children, as well as his ability to lift a gallon of milk with his right hand (Tr. 19–20; *see also* Tr. 164).  The ALJ did not err in considering such activities along with other evidence in the record in evaluating Plaintiff's subjective complaints of disabling pain and other symptoms.  20 C.F.R. § 404.1529(c)(3)(i).  Although Plaintiff's descriptions of his activities show some limitations, the ALJ is not required to believe all of a claimant's assertions concerning his activities.  *See* Johnson v. Chater, 87 F.3d 1015, 1018 (8th Cir. 1996).  Lastly, the ALJ noted that Plaintiff had earnings in 2005, although he alleged disability beginning in July 2004 (Tr. 17, 20).  Although low, Plaintiff's earnings were properly considered as any work done during a period in which he believes he is disabled, as such work may show that Plaintiff is able to perform work at the substantial gainful activity level.  *See* 20 C.F.R. § 404.1571;  Wolfe,  86 F.3d at 1078 (in discounting Plaintiff's complaints of pain, ALJ did not err in considering fact that claimant worked washing mobile homes during the adjudicated period).

Thus, because the ALJ articulated his reasons for finding Plaintiff less than fully credible, and the reasons cited are substantially supported by the record, Plaintiff is not entitled to relief.  *See* Foote, 67 F.3d at1562 (a clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court); MacGregor, 786 F.2d at 1054 (same).

      C.      Plaintiff's Treating Physician

As Plaintiff's final claim for relief he asserts that the ALJ erred in rejecting the opinions of Dr. Ismail, a treating physician.

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See* Lewis, 125 F.3d at 1439–41; Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991); Sabo v. Chater, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d). "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips v. Barnhart, 357 F.3d 1232, 1240-41 (11th Cir. 2004) (citation omitted). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See* Edwards, 937 F.2d at 580 (finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

Here, the ALJ rejected the opinions of Dr. Ismail contained on the "check-off type forms" provided to him by Plaintiff's counsel, including Dr. Ismail's opinion that Plaintiff was unable to work (*see* Tr. 20). The ALJ rejected these opinions as "conclusory and not supported by [Dr. Ismail's] own treatment notes or by the record on the whole" (Tr. 20). With regard to the conclusory nature of the opinions, the ALJ noted that Dr. Ismail's opinions on the forms—including those stating that Plaintiff's "shoulder dislocation rendered him [permanently] unable to work," or similarly, that Plaintiff could not work, even while sitting or standing—were accompanied by no explanation (Tr. 18). Indeed, on each of the four forms provided to Dr. Ismail by Plaintiff's counsel, Dr. Ismail checked boxes, circled multiple-choice answers, or simply wrote "yes" or "no" in response to certain questions, but provided no explanation for his opinions (*see* Tr. 144, 152, 153, 154). It was entirely appropriate for the ALJ to reject the opinions as "conclusory." *See* Phillips, 357 F.3d at 1240–41. The ALJ also considered, properly, that a statement by a medical source that a claimant is "disabled" or "unable to work" is an opinion on the issue of disability reserved strictly to the Commissioner, and need not be accepted as true (Tr. 20).

Likewise, the ALJ appropriately considered that Dr. Ismail's opinions on the "check-off" forms are not supported by his treatment notes, *see* Phillips, 357 F.3d at 1240–41, and the ALJ's findings in this regard are substantially supported by the record. For example, Dr. Ismail's records

generally reflect normal physical examinations. The treatment records also reflect that Dr. Ismail never advised or otherwise recommended to Plaintiff that he restrict his physical activity in any way or refrain from working or volunteering, although he included such opinions on the forms.[18] *See* Choate v. Barnhart, 457 F.3d 865, 870 (8th Cir. 2006) ("There is no indication in the treatment notes that [] any of [the claimaint's] doctors restricted his activities, or advised him to avoid prolonged standing or sitting."). Moreover, as previously discussed, Plaintiff's treatment was entirely conservative (that is, he was prescribed pain medication only), and Dr. Ismail did not refer Plaintiff to a specialist or recommend surgery, physical therapy, injections, or any other type of treatment, as would be expected if Plaintiff's condition caused the disabling limitations noted on the forms filled out by Dr. Ismail. Indeed, Dr. Ismail specifically noted that Plaintiff required no additional treatment (*see* Tr. 152). Furthermore, in addition to providing conservative treatment only, Dr. Ismail never changed Plaintiff treatment (the treatment notes reflect that Plaintiff was prescribed "Lortab 10s," in twenty or thirty-pill quantities, throughout his course of treatment (*see* Tr. 116, 118–21, 123–29, 145–49)). Thus, the notes suggest that Plaintiff's treatment regimen was effective, and similarly, that Plaintiff's pain was adequately controlled, since Dr. Ismail consistently prescribed the same medication in the same amount.

Similarly, as the ALJ found, Dr. Ismail's opinions are inconsistent with the record as a whole (*see* Tr. 20), including (1) evidence regarding Plaintiff's daily activities, (2) the opinions of the Dr. Brooks (which note limitations with regard to the right arm but clearly do not preclude Plaintiff from all work, even sedentary work, or preclude Plaintiff from volunteering or attending classes), (3) the opinions of non-examining agency physician Dr. Louis, (4) Plaintiff's own reports, such as those

---

[18] A treatment note dated February 27, 2007, reflects that Plaintiff reported he could not work with his right arm and asked Dr. Ismail to fill out disability paperwork (Tr. 116). On the same treatment note, in a section of the note titled "plan," Dr. Ismail wrote "can't work" (*see id.*). To the extent the notation is construed as an opinion of Dr. Ismail, it is clearly based on Plaintiff's report to him that day, and as previously discussed Plaintiff was found less than fully credible by the ALJ. Thus, the opinion is not credible for the same reasons Plaintiff's subjective complaints were discounted; likewise, the opinion is not credible for the same reasons the opinions of Dr. Ismail on the "check-off" forms were rejected by the ALJ. Plaintiff's argument to the contrary is not persuasive (Plaintiff asserts that because the ALJ rejected only the "check-off" opinions on the forms, and accepted the other opinions of Dr. Ismail, he must have necessarily accepted the "can't work" notation on the February 2007 treatment note (*see* Doc. 14 at 14; Tr. 20); it is clear, however, from a reading of the ALJ's opinion that this is not the case and that the ALJ rejected all of the conclusory opinions of Dr. Ismail—in whatever form they appear in the record—that Plaintiff could not work).

made to SSA agency employees and those found on the Disability Reports, (5) Plaintiff's testimony, and (6) Plaintiff's ability to perform remodeling work after the date he alleges he became disabled.

And finally, as noted *supra*, Dr. Ismail's opinions on the form regarding Plaintiff's shoulder and his "limitations and abilities," dated December 4, 2008, are internally inconsistent (Tr. 154–55). For example, Dr. Ismail opined that Plaintiff could work only two hours, total, in a workday, but on the same form he opined that Plaintiff could stand two hours and sit eight hours in a workday (Tr. 154). He also opined that Plaintiff could both "frequently" and "never" use his left arm below shoulder level (*id.*). And, Dr. Ismail reported that Plaintiff's left shoulder was completely normal, yet he opined that Plaintiff could never raise his left arm above shoulder level (Tr. 154–55).

For all these reasons, the ALJ properly discounted the opinions of Dr. Ismail on the "check-off" type forms. And, having done so, the ALJ properly accorded great weight to remaining opinions of record (*see* Tr. 20).[19] While the opinion of a treating physician is entitled to deference, once his opinion has been properly rejected, the ALJ may rely upon the opinion of an agency examiner or reviewer. *See generally* 20 C.F.R. § 404.1527; *see also* Edwards, 937 F.2d at 584–85 (11th Cir. 1991) (holding that a non-examining physician's opinion can be relied upon where it is consistent with the record overall); Oldham v. Schweiker, 660 F.2d 1078, 1084 (Former 5th Cir. Unit B Nov. 1981) (noting that the opinion of a treating physician is generally entitled to more weight than that of a non-treating physician, but an "ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion"; thus, the ALJ did not err in accepting the opinion of a reviewing physician over that of the claimant's treating physician).

A remaining contention made by Plaintiff, however, must be addressed. Plaintiff asserts that Dr. Ismail's opinions on the form titled Clinical Assessment of Pain (Tr. 153) are consistent with Dr. Ismail's treatment notes, which reflect Lortab prescriptions for more than two years; therefore, specifically with regard to this form, the ALJ erred in finding the treatment notes inconsistent with the form (*see* Doc. 14 at 13). Although Plaintiff was indeed prescribed Lortab, he did not complain to Dr. Ismail regarding any side-effects of the medication, and as noted, Dr. Ismail never changed

---

[19] Although the ALJ stated that—in addition to the opinions of Dr. Brooks and Dr. Louis—he was assigning "great weight" to the opinions of the "remaining treating physicians," this is obviously a scrivener's error, as Plaintiff had no treating physicians other than Dr. Ismail. The error, however, warrants no relief in this case as it is clear from the ALJ's opinion that he discounted only the conclusory opinions of Dr. Ismail and thereafter relied upon the other opinions in the record.

Plaintiff's medication.  *See* <u>Kelley v. Chater</u>, 62 F.3d 335, 338 (10th Cir. 1995) (in discounting

claimant's allegation that he "needed a two-hour nap each day," ALJ considered fact that he never

reported this to his physician).  Moreover, while Plaintiff testified at his hearing that Lortab made

him drowsy and, therefore, he needed to nap about three times a day (Tr. 165–66), Plaintiff told Dr.

Brooks he took Lortab only "at bedtime" (Tr. 130), and on a Disability Report he specifically stated

that the Lortab caused no side effects (Tr. 91).  Thus, Plaintiff's testimony regarding disabling

medication side effects (like the side effects noted by Dr. Ismail on the pain form) is inconsistent,

not only with his failure to report any such side effects to Dr. Ismail, but also with his own, earlier,

statements.  Moreover, Plaintiff testified that he could return to work but for his arm and that he was

able to babysit his children, care for his personal needs, complete his daily living activities, follow

the news, read the Bible, attend church, and go fishing (Tr. 97, 109, 165–67, 169–73), which

abilities seem inconsistent with Dr. Ismail's restrictive and limiting opinions on the pain form.[20]

Accordingly, the ALJ did not err in rejecting those opinions as "conclusory" <u>and</u> as inconsistent with

Dr. Ismail's treatment records and other credible evidence in the record.  Thus, Dr. Ismail's opinions

on the Clinical Assessment of Pain Form, like his other conclusory opinions, were properly rejected

by the ALJ.

VI.     CONCLUSION

        The ALJ incorporated his pertinent findings, such as his RFC finding and those findings

concerning Plaintiff's credibility and Dr. Ismail's opinions, into a hypothetical question that was

posed to a VE.  In response, the VE testified that the hypothetical person could perform "other"

work as a gate guard, ticket taker, parking lot cashier, surveillance-system monitor, and order clerk.

Moreover, the VE specifically testified that the person could perform the other work he identified

even if he could only occasionally reach, handle, and finger with his right hand below shoulder level

(Tr. 180).  Relying on this testimony, the ALJ properly concluded that Plaintiff was not disabled

because other work existed in that Plaintiff could perform.  *See* <u>Crawford v. Comm'r Soc Sec.</u>, 363

F.3d 1155, 1161 (11th Cir. 2004) (vocational expert testimony is substantial evidence of other work

---

[20] Plaintiff's contention appears to concern only the side effects of Lortab, but to the extent his contention also concerns the side effects of Xanax, the same reasons for upholding the ALJ's decision apply.  Moreover, as noted *supra*, Plaintiff was not consistently prescribed Xanax (including at the time of Brooks' examination (*see* Tr. 130)), and when Plaintiff was prescribed Xanax he took it only "as needed" and did not report any side effects to agency employees (*see, e.g.* Tr. 91) or to Dr. Ismail.

that a claimant can perform when that testimony is based on a properly phrased hypothetical question comprising all of the claimant's limitations). Thus, the ALJ's finding that Plaintiff is not disabled is supported by substantial evidence and should not be disturbed. 42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at1560.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this 26th day of October 2010.


/s/ Elizabeth M. Timothy
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

Any objections to these proposed recommendations must be filed within fourteen (14) days after being served a copy hereof. Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control. A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).